AO 91
Rev. 11/82

CRIMINAL COMPLAINT     ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>ERIK LEONARDUS PEETERS | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>09-   **09-0992M** |
|---|---|

Complaint for violation of Title 18, United States Code § 2423(c)

| NAME OF MAGISTRATE JUDGE<br>Ralph Zarefsky | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>Between on or about<br>April 26, 2008 and<br>February 24, 2009 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT
MAY 12 2009
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Between on or about April 26, 2008 and February 24, 2009, defendant ERIK LEONARDUS PEETERS traveled in foreign commerce, from Los Angeles, California, to Cambodia, and engaged in illicit sexual conduct, as defined in Title 18, United States Code, Section 2423(f), with John Doe 1, John Doe 2 and John Doe 3, all of whom are minors.

LODGED
2009 MAY 12 PM 2:10
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
        (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the<br>foregoing is true and correct to the<br>best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Special Agent Patrick Li |
|---|---|
| | OFFICIAL TITLE<br>Special Agent - Bureau of Immigration and Customs<br>Enforcement |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE (1)<br><br>HONORABLE RALPH ZAREFSKY | DATE<br><br>May 12, 2009 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

PAD:rjm        REC: Detention

## AFFIDAVIT

I, Patrick Li, being duly sworn, do hereby depose and state:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") and have been so employed since March of 2003.  I was previously employed with the U.S. Customs Service ("USCS") as a Special Agent since June of 1998.  I am currently assigned to the Child Exploitation Investigative Group at the Special Agent in Charge, Los Angeles, CA ("SAC/LA").

2.   This affidavit is made in support of a complaint and arrest warrant charging ERIK LEONARDUS PEETERS with violating Title 18, United States Code, Section 2423(c), which states, "Any United States citizen or alien admitted for permanent residence who travels in foreign commerce and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years or both."  The definition of "illicit sexual conduct" is set forth in Title 18, United States Code, Section 2423(f).

3.   The facts set forth in this Affidavit are based upon my personal observations, my training and experience, and

1

information obtained from other law enforcement officers and non-governmental organizations (NGOs). This Affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter. To the extent that any information in this Affidavit is not within my personal knowledge, it was made known to me through reliable law enforcement sources, and I believe it to be true. In particular, I was stationed at the office of the ICE Attaché in Bangkok, Thailand ("ICE Bangkok") for four years, from 2004 until 2008, and I have participated in numerous sex tourism investigations in Thailand and Cambodia. I have worked with law enforcement and NGOs in Southeast Asia in connection with sex tourism investigations. I am familiar with the methods used by illicit sex tour operators, participants and facilitators to acquire underage victims and to avoid law enforcement detection.

4.   One of the NGOs that I worked with in Cambodia is Action Por Les Enfants ("APLE"). Based on my experience with APLE, and based on its website, http://www.aplecambodia.org, I know the following about APLE:

a.   APLE is a non-governmental human rights organization established to combat the sexual exploitation of children.   APLE seeks to monitor the prevalence of child sexual abuse in Cambodia and report such abuse to the relevant authorities.   APLE's lawyers provide pro bono legal advice and representation to child victims of sexual abuse and their families.   APLE has social workers provide child victims with access to counseling and social rehabilitation.   APLE further contributes to the global efforts to combat the causes and effects of child sexual abuse through research and advocacy.

b.   APLE's PROTECT project was commenced in January 2003 to protect children from all forms of sexual exploitation. Since its inception, the project has focused on street-based child sexual exploitation.   Child sexual exploitation in Cambodia generally is either establishment-based or street-based.   Establishment-based child sexual exploitation is facilitated through established sex houses.   Street-based child sexual exploitation is facilitated personally by a child sex offender or intermediary who approaches children directly on the streets, beaches, markets or other public areas in order to commence a sexual relationship with them.   The majority of perpetrators of this type of abuse are western nationals, which

3

makes APLE's focus an international one.  Since the majority of civil society organizations working in Cambodia to address child sexual abuse focus on Cambodian perpetrators, the PROTECT project operates in a niche market within that civil society community.

      c.   APLE's objectives include the following:

        i.   Intervention and aftercare:  To emancipate victims from child sexual abuse and reduce the effects of trauma caused by such abuse.

        ii.  Legal protection:  To increase the level of access to legal protection afforded to victims of child sexual abuse.

        iii. Breaking the cycle:  To lessen the likelihood of vulnerable children becoming victims, and victims becoming recurring victims, through awareness and social care.

        iv. Criminal accountability:  To improve current conditions of impunity and legal accountability of child sex offenders in Cambodia through cooperation with Cambodian and international law enforcement officials and bodies and through awareness raising on child sexual exploitation issues.

      d.   As part of its mission to bring criminal accountability to child sex tourists in Cambodia, APLE has

established formal agreements with the Ministry of Foreign Affairs and International Cooperation of the Kingdom of Cambodia and the Ministry of Social Affairs, Veterans and Youth Rehabilitation of the Kingdom of Cambodia.  In addition, APLE works closely with the Cambodian National Police, ICE, the United Kingdom Child Exploitation and Online Protection, the German Federal Police-BKA, and other international law enforcement.  APLE also works with other NGOs, such as Our Hope Cambodia, World Hope International, M'lop Tapang, Cambodia, Village Focus International, and the End Child Prostitution, Pornography and Trafficking (ECPAT) International Network, among others.

e.   APLE investigators conduct undercover investigations, intelligence gathering and monitoring activities in order to collect evidence to rescue victims and prosecute perpetrators of child sexual exploitation.  These activities include operating investigative teams and leasing with informants; investigating cases of suspected child sexual abuse to obtain evidence; monitoring suspicious persons or persons previously convicted of child sex offenses on a referral basis; and collaborating with and referring intelligence to Cambodian and foreign law enforcement officials.

5

## II.   PEETERS' BACKGROUND

5.   In June 2008, ICE received information from APLE that PEETERS was travelling in Cambodia with two underage Cambodian males.   Based on APLE's investigation, which included surveillances and interviews, PEETERS was suspected of engaging in sexual acts with two underage Cambodian males while travelling to various places in Cambodia.

6.   In June 2008, I received the following information that APLE had provided to ICE concerning PEETERS:   PEETERS' date of birth is August 12, 1968, and the number on the United States passport that PEETERS used to travel to Cambodia is 209015896. With this information, I accessed a law enforcement database and learned that PEETERS' residence is located in Norwalk, California.

7.   Utilizing PEETERS' date of birth and U.S. passport number, I determined from a domestic and international law enforcement database that PEETERS departed Los Angeles International Airport on or about April 26, 2008, and that he arrived in Cambodia on or about May 23, 2008.

8.   I also accessed criminal history databases and learned that on August 18, 1990, PEETERS was convicted of violating California Penal Code Section 288(a), lewd and lascivious acts

6

with children under 14 years old.  I reviewed records pertaining to that conviction and learned that on or about April 13, 1990, PEETERS touched an underage male victim around the pubic and anal area while both were in a public swimming pool.

## III.  INVESTIGATION IN CAMBODIA

9.   In June 2008, APLE provided ICE with information that PEETERS was travelling in Cambodia with two minor males, John Doe 1 and John Doe 2.

### A.   John Doe 1

10.   On January 29, 2009, I interviewed John Doe 1 at the facilities of APLE in Phnom Penh, Cambodia, with the permission of John Doe 1's grandmother, who was also present.  The interview was conducted in the presence of ICE SA Kevin Panganiban, ICE Attaché Bangkok ("ICE/BK") SA Tashima Mack, ICE Phnom Penh Foreign Service National Investigator Vansak Suos, and APLE Child Protection Coordinators Tim Houn and Pen Rotha. The interview was recorded.  I asked the questions in English and Investigator Suos translated between English and Khmer. John Doe 1 speaks Khmer, the native language of Cambodia.  He does not speak English.

11.   John Doe 1 told me his name and that he is 13 years old, but he does not know the calendar date on which he was

born.   John Doe 1 told me that he lives in Phnom Penh, Cambodia, he does not attend school, and he currently supports himself and family members by shining shoes.

12.   I presented John Doe 1 with six pictures of Caucasian males.   John Doe 1 selected picture number 4, which was of PEETERS, and told me that the man in picture number 4 is Erik. John Doe 1 stated that he did not know Erik's last name and did not know where Erik came from, but that John Doe 2 would know those things.   John Doe 1 stated that he met Erik during the summer of last year [2008] through John Doe 2.

13.   I presented 4 random photographs of Cambodian boys assembled by APLE for identification purposes, and John Doe 1 selected picture number 3 and correctly said that it was John Doe 2.

14.   John Doe 1 stated the following:

a.   He met Erik in Kean Svay.

b.   Erik had asked John Doe 2 if John Doe 2 had a friend, so John Doe 2 introduced John Doe 1 to Erik.

c.   John Doe 1 was 12 years old when he met John Doe 2, and John Doe 2 is two years older than John Doe 1.

d.   Erik and John Doe 2 are relatives, and they live together.

8

e.    Erik asked John Doe 1 to stay with John Doe 2 at a guest house.   John Doe 1 did not remember the name of the guest house, but knows that it was in the Prek Veny area.   The guest house had a pool, a bed in the room, a television set, and a bathroom.   The room was on the ground floor, but John Doe 1 did not recall the room number they stayed in.   There was one bed inside the room.   John Doe 1 spent the night with Erik and they took a shower together.

f.    When I asked if Erik physically touched John Doe 1, he told me that Erik would touch his (John Doe 1's) penis in the shower.   Erik was also naked in the shower.   John Doe 1 did not like Erik touching his penis, so he pushed away Erik's hands.   John Doe 1 did not touch Erik's penis.   John Doe 2 also took a shower together with Erik and John Doe 1.   John Doe 1 did not know how many times they all took showers together.

g.    Erik, John Doe 1, and John Doe 2 slept together in the same bed.   Sometimes both John Doe 1 and John Doe 2 were naked when they were sleeping with Erik.   Erik embraced John Doe 1 in bed while they were sleeping together.

h.    Erik occasionally gave John Doe 1 money, between five and ten U.S. dollars.   Erik also gave John Doe 1 food and clothes, and Erik gave money, clothes and food to John Doe 2.

9

John Doe 2 told John Doe 1 that Erik gave money to John Doe 2's mother, although John Doe 1 does not know the amount.

i.    Erik had a camera, and Erik took pictures of John Doe 2 and John Doe 1 naked together.  Erik took the pictures of the boys naked when the boys were standing up side by side. John Doe 1 believed that pictures were taken because he saw a red flash of light.  Erik also had a black color computer, and John Doe 1 played games on Erik's computer.

j.    I asked if John Doe 1 had seen Erik and John Doe 2 touch each other, and John Doe responded affirmatively and said that Erik's penis was erect and hard when Erik was touching John Doe 2's penis.  John Doe 1 saw John Doe 2 hold Erik's penis.  I asked how, and John Doe 1 gestured with his open hands and simulated a rubbing motion.  I asked John Doe 1 the size of Erik's penis, and John Doe 1 demonstrated size by displaying the distance from his wrist to his elbow.

k.    When Erik and John Doe 2 were touching each other's penis, John Doe 1 was sitting on the floor watching TV. Erik and John Doe 2 were sitting on the middle of the bed while they were touching each other.  I asked John Doe 1 if he joined them, and John Doe 1 said that he did not join them and that John Doe 2 was upset with John Doe 1 for not participating.

10

l.    John Doe 1 traveled with Erik and John Doe 2 to Sihanoukville, Cambodia, where they stayed at other guest houses.  Erik did not seek permission from John Doe 1's family to take John Doe 1 to different guesthouses overnight.

m.    John Doe 1 has not seen Erik or John Doe 2 since last summer [2008], and he does not have any reason to see them anymore.

15.   On February 17, 2009, I conducted another recorded interview of John Doe 1 at the APLE office in Phnom Penh, Cambodia.  SA Panganiban and Investigator Sous were also present, and Investigator Suos translated.

16.   John Doe 1 stated that after his first interview with me, he spoke with the police, who asked him about Erik.  I asked John Doe 1 if Erik ever put his penis inside John Doe 1's anus, and John Doe 1 said yes.  He stated that this occurred in the bedroom of the guesthouse in Preah Veah, and that John Doe 2 was present.  I asked if Erik's penis had gone all the way into his anus, and John Doe 1 stated no and gestured the length from his knuckle to the top of his index finger.   I asked if Erik wore a condom, and he said no.  I asked if Erik used any lotion or cream, and he said yes.  I asked what John Doe 2 was doing when this happened, and he stated that John Doe 2 was sleeping.   I

asked if it hurt, and he said no.  He said that Erik did this to him one time.  I asked if Erik had bought any toys, clothes or money afterwards, and he said no.  I asked him if he told Erik to stop, and he stated that he did ask Erik to stop and that Erik did stop.  He also stated that Erik put his mouth on John Doe 1's penis.  I asked if Erik took pictures of his penis in John Doe 1's anus, and he said no.  I asked John Doe 1 why he had not told me this information previously when I had asked those questions, and he responded that I did not ask him.  I asked if he remembered how much money Erik had given him, and he said fifteen U.S. dollars.

**B. John Doe 2**

17.  On February 12, 2009, I interviewed John Doe 2 at the facilities of APLE in Phnom Penh, Cambodia, with the permission of his mother, who was waiting for him outside.  The interview was conducted in the presence of SA Panganiban, Investigator Suos and APLE Child Protection Coordinators Tim Houn.  Prior to the interview, I was informed by Mr. Houn that John Doe 2 was questioned earlier that day by the Cambodian National Police ("CNP") concerning PEETERS' relationship with John Doe 2.  I asked the questions in English and Investigator Suos translated. John Doe 2 speaks Khmer.  He does not speak English.

12

18.   John Doe 2 told me his name and that he is 14 years old.  He does not know the western calendar date of his birth, but knows that it was in the Chinese year of the Dog.  He told me that he was born in Cambodia, he currently lives with his mother and father in Phnom Penh, he does not attend school, and he stopped attending school after completing the second grade.

19.   I presented John Doe 2 with six pictures of Caucasian males.  John Doe 2 selected picture number 4, which was of PEETERS, and said that the man in picture number 4 is "Erik".

20.   John Doe 2 told me the following:

a.   He did not know Erik's last name, but he knew that Erik came from America and was 35 years old.  I asked John Doe 2 how he knew Erik's age, and John Doe 2 said that he saw Erik write it down on a contract for a house.

b.   John Doe 2 met Erik six or seven months ago, when Erik approached John Doe 2 and asked him to clean his house. Erik lived alone in a rental house in Phnom Penh near the Kampun market area.  John Doe 2 could not remember the name of the rental house.  John Doe 2 remembered that Erik's room was on the bottom floor.  He did not remember the room number.  When they met, Erik approached John Doe 2 when John Doe 2 was outside with his mother.  Erik could not speak Khmer, so through gesturing

13

Erik communicated to John Doe 2 that he wanted his room cleaned. John Doe 2 went to Erik's room alone for a few days, and then his [John Doe 2's] mother came.

21.   I asked John Doe 2 if he had spoken to the CNP earlier that day, and he said yes.  I asked John Doe 2 if he knew why I was talking to him now, and he said he did not know the reason. I told John Doe 2 that we were there to determine if anything wrong was done to him, and John Doe 2 told me that he understood.  I asked John Doe 2 if he had ever had sex with Erik, and he said yes.  When I asked John Doe 2 to describe what kind of sex that he had with Erik, John Doe 2 told me that he could not describe it unless I asked him questions.

22.   When I asked John Doe 2 if he had ever showered with Erik, he said that they showered together.  John Doe 2 said that Erik took off John Doe 2's clothes and then cleaned his body. When I asked John Doe 2 if Erik touched John Doe 2's penis, he said no and that Erik told John Doe 2 to clean his own penis in the shower.  I asked John Doe 2 whether Erik's penis was erect when he was with Erik in the shower, and he said yes.  I asked John Doe 2 if Erik's penis was hard or soft, and he said that it was hard.  I asked John Doe 2 if he touched Erik's penis in the

shower, and he said no.  John Doe 2 told me that Erik did not touch John Doe 2's penis in the shower.

23.  When I asked John Doe 2 what happened after they took a shower together, John Doe 2 said that they went to bed.  I asked John Doe 2 if they (John Doe 2 and Erik) slept on the same bed together, and he said that they did.  John Doe 2 said that he went to bed without clothes on, and that Erik wore only shorts in bed.  John Doe 2 said that in bed, Erik took John Doe 2's hand to play with Erik's penis, and Erik would also be touching John Doe 2's penis.  John Doe 2 said that after this, Erik would put his penis inside John Doe 2's anus, and John Doe 2 was in pain.  I asked John Doe 2 if he told Erik to stop, and he said that he did, and that Erik did stop.  John Doe 2 stated that Erik did not use any oil or lubricant or a condom during the anal sex.  I asked John Doe 2 if Erik's entire penis entered John Doe 2's anus and he told me just not all of it.  I asked John Doe 2 about how many times Erik put his penis in his anus, and he said about twenty separate times.

24.  I asked John Doe 2 if Erik placed his mouth on John Doe 2's penis, and he said that Erik did this about ten to fifteen separate times.  John Doe 2 stated that Erik wanted to

put his penis in John Doe 2's mouth, but John Doe 2 did not do that.

25.   I asked John Doe 2 what position he was in when Erik put his penis inside John Doe 2's anus, and he said that sometimes he was lying straight down and sometimes face up. John Doe 2 told me that this happened during the day and night times.  John Doe 2 did not know whether Erik ejaculated.  John Doe 2 told me that afterwards, Erik would give him money, between five and ten U.S. dollars each time.  I asked John Doe 2 to explain why Erik would give him money and he did not understand why.  I asked John Doe 2 when the last time he saw Erik, and he said two months ago.

26.   I asked John Doe 2 whether he had introduced any friends to Erik.  John Doe 2 told me that he introduced John Doe 1 to Erik.  John Doe 2 told me that John Doe 1 was either the same age or younger than John Doe 2.  John Doe 2 introduced John Doe 1 to Erik because Erik wanted to know if John Doe 2 had a friend.

27.   I asked John Doe 2 what Erik did when John Doe 1 was introduced to him.  John Doe 2 said that Erik showered naked with John Doe 1.  John Doe 2 said that he saw Erik touch John Doe 1's penis, but he did not see Erik put his penis in John Doe

16

1's anus.  When I asked John Doe 2 if Erik ever touched John Doe 1 and John Doe 2's penis while they were in bed together, John Doe 2 said yes.

28.  I asked John Doe 2 if Erik had a computer, cell phone or camera.  John Doe 2 answered yes to all three.  John Doe 2 told me Erik's cell phone number.  John Doe 2 told me that Erik's computer was a black colored laptop.  When I asked John Doe 2 if Erik took pictures of John Doe 2 or John Doe 1, he told me that Erik did take pictures of them.  I asked John Doe 2 if they were wearing any clothes when Erik took pictures of them, and John Doe 2 said that sometimes they were naked and sometimes they were not.  John Doe 2 said that when Erik took pictures of them naked, it was because they had finished taking a shower.

29.  I asked John Doe 2 if Erik ever took pictures when he was touching John Doe 2's penis.  John Doe 2 said that Erik would be touching John Doe 2's penis with one hand while taking pictures of it with his other hand.  I asked John Doe 2 if Erik ever asked him to touch John Doe 1's penis, and John Doe 2 said yes, however, John Doe 2 refused to do it.

30.  I asked John Doe 2 how long John Doe 1 was with Erik, and he told me John Doe 1 would sometimes leave Erik and John Doe 2.  However, John Doe 1 would return, the total time that

17

John Doe 1 stayed with John Doe 2 and Erik was about one month. I asked John Doe 2 where the three went when they were together. John Doe 2 told me that that they were in Phnom Penh and Sihanoukville. John Doe 2 told me that Erik took him to Battambang without John Doe 1. I asked John Doe 2 if he saw Erik give money to John Doe 1, and John Doe 2 said that he saw Erik give five U.S. dollars to John Doe 1.

31. I asked John Doe 2 if Erik ever told him to not tell anyone about what they did together concerning the sexual activities. John Doe 2 said that Erik told him to not tell anyone because they would tell the police. I asked John Doe 2 if Erik is afraid of the police and John Doe 2 said yes, but he did not understand why Erik was afraid of the police.

32. I asked John Doe 2 if Erik ever gave John Doe 2's mother any money. John Doe 2 told me that Erik gave her more than a hundred U.S. dollars. I asked John Doe 2 if Erik is currently giving him money now. John Doe 2 said no. I asked John Doe 2 why he was no longer with Erik and he told me that Erik did something bad and the police are following him.

33. I asked John Doe 2 if he knew whether Erik was with any boys in addition to him and John Doe 1. John Doe 2 stated that there was one in Kom Province, but John Doe 2 did not know

18

his name.  I asked John Doe 2 how old was that boy and he told me that he was younger than himself.  John Doe 2 told me that Erik spent the night with the boy and the boy had a problem or injury with his eye.

34.  At the conclusion of the interview, I asked John Doe 2 if Erik still contacted him.  John Doe 2 said yes, that Erik called him yesterday afternoon on his mother's cell phone.  I asked John Doe 2 what his conversation with Erik was about, and he said that they did not talk a lot, but Erik did ask where John Doe 2 was located.  In that conversation, Erik told John Doe 2 that Erik was in Battambang yesterday.

**C.   John Doe 3**

35.  On March 13, 2009, John Doe 3 was interviewed by SA Nguyen and Investigator Sous.  The audio and video recorded interview was conducted after SA Nguyen received permission from the mother of John Doe 3,  who was also present in the interview.  Investigator Sous translated the interview from English to Khmer.

36.  On April 27, 2009, I reviewed the interview after it was forwarded to me by SA Nguyen.  I learned that John Doe 3 is a male and was 13 years old on the date of the interview.  I observed from the interview and still images that SA Nguyen took

19

that John Doe 3's right leg is several inches shorter than his left leg.

37.   I observed SA Nguyen present six pictures of random Caucasian males to John Doe 3.   This set of photographs was different from the one used for John Doe 1 and John Doe 2.   John Doe 3 identified photograph number 6.   Photograph number 6 is the correct photograph of PEETERS.   John Doe 3 was also able to accurately describe PEETERS as being bald.

38.   When SA Nguyen asked John Doe 3 for PEETERS' name, John Doe 3 said it was "ALEX".   John Doe 3 told SA Nguyen that PEETERS took John Doe 3 to Siem Reap, Cambodia, approximately a month before the interview.   John Doe 3 said that PEETERS met him while he was begging in Kompong Province and that PEETERS took John Doe 3 to Siem Reap, Cambodia on his [PEETERS'] black motorcycle.   John Doe 3 said that PEETERS wanted to bring John Doe 3 to a hospital in Siem Reap to examine his leg.   John Doe 3 told SA Nguyen that he did not want to go with PEETERS, but PEETERS continued travelling to Siem Reap without informing John Doe 3's parents.

39.   When John Doe 3 and PEETERS reached a guesthouse in Siem Reap, John Doe 3 took a shower.   In the shower, PEETERS inserted his penis inside the anus of John Doe 3.   John Doe 3

20

said that he was with PEETERS in Siem Reap for approximately two to three days. During this time, John Doe 3 said that PEETERS brought him to the hospital to have his leg examined.

40. John Doe 3 also said that PEETERS took pictures of him sleeping naked. John Doe 3 knows this because he later saw those nude pictures of himself on PEETERS' camera.

41. John Doe 3 said that PEETERS brought John Doe 3 to Angkor Wat and the airport in Siem Reap. When PEETERS brought John Doe 3 back to his house, PEETERS met John Doe 3's parents.

42. When SA Nguyen asked John Doe 3 how many times PEETERS took him to Siem Reap, John Doe 3 said that they went to Siem Reap together approximately 5 times. John Doe 3 said that each time in Siem Reap PEETERS put his penis in John Doe 3's anus, and that PEETERS applied lotion on John Doe 3's anus prior to inserting his penis into John Doe 3's anus.

43. When SA Nguyen asked John Doe 3 if PEETERS gave him any money, John Doe 3 said no. John Doe 3 said that PEETERS gave John Doe 3's parents 10,000 Riel and 2 kilograms of rice.

44. I know that Angkor Wat is a tourist attraction in Siem Reap known for its ancient Cambodian temples and stone carvings. I also know that 10,000 Riel is approximately $2.41 United States dollars.

D.    Medical Examinations

45.   On February 24, 2009, John Doe 2 was examined by Dr. Laura Watson at the SOS Medical Clinic in Phnom Penh, Cambodia. Dr. Watson concluded that no scarring was visible on his anus and there was no gaping or reflex dilatation, which means that the examination did not reveal visible signs of anal sex.

46.   On February 24, 2009, John Doe 1 was examined by Dr. Laura Watson at the SOS Medical Clinic in Phnom Pehn, Cambodia. Dr. Watson concluded that no scarring was visible on his anus and there was no gaping or reflex dilatation, which means that the examination did not reveal visible signs of anal sex.

E.    Interviews of Mothers

47.   On February 12, 2009, I attempted to interview the mother of John Doe 1. She lives in poverty and is a beggar, and she indicated that she does not know about her son's involvement with PEETERS.

48.   On February 12, 2009, I interviewed the mother of John Doe 2. She lives in poverty and stated that her job is picking up plastic bottles for recycling. She stated that she received approximately $100 from PEETERS, she believed that PEETERS loved and wanted to take care of John Doe 2, and she needed the money that PEETERS was providing her.

22

F.    Interviews at Guesthouses

49.    On January 29, 2009, SAs Panganiban and Mack and Investigator Suos interviewed Chiheng and Mouygex Voeung, managers of the Mean Hong family-owned guesthouse located in a sub-province area of Phnom Penh, Cambodia.  They went to this guesthouse because APLE investigators had previously followed PEETERS there.

50.    Mouygex was shown photospreads that included PEETERS' photographs, and did not recognize anyone in the photospreads. When SA Panganiban mentioned the name "Alex", Mouygex Voeung recalled that an individual by that name had stayed at Mean Hong guesthouse.  Mouygex Voeung stated that "Alex" had stayed at the guesthouse approximately three to four months ago.  Mouygex Voeung initially stated that "Alex" had stayed at the guesthouse one night, but then recalled that "Alex" stayed two nights at the guesthouse. Mouygex Voeung indicated that "Alex" ordered fried rice from the family kitchen.  Mouygex Voeung further stated that "Alex" told her that he was from Hollywood.  Mouygex Voeung stated that "Alex" told her that he was looking to run a computer business while he was in Cambodia.

51.    Chiheng Voeung stated that "Alex" drove a 2007 black Honda Dream motorbike.  Chiheng Voeung stated that "Alex"

arrived at the guesthouse with a young boy, approximately 14 years old, whose name "Alex" did not provide. Chiheng Voeung remembered that PEETERS carried a large backpack. Mouygex Voeung stated that "Alex" told her that he took the boy from an orphanage. Mouygex Voeung further stated that "Alex" and the boy stayed inside the room fifty percent of the time, and they spent the other fifty percent away from the guesthouse. Mouygex Voeung stated that they would leave during the daytime and return to the guesthouse at night. Mouygex Voeung indicated that "Alex" seemed like he cared for the boy, and she also stated that she never observed them touching each other. Mouygex Voeung indicated that "Alex" and the boy stayed in room number 6.

52.   On January 29, 2009, SAs Panganiban and Mack and Investigator Suos interviewed Den Ngorm, facilities manager at 'Club Evergreen' guesthouse located in a sub-province area of Phnom Penh, Cambodia. Ngorm examined a photospread containing PEETERS' photograph in position number 4, and he identified the man in number 4 as having stayed at that guesthouse under the name "Alleq". Ngorm stated the following:

a.   "Alleq" had stayed at the guesthouse during August or September 2008 with a boy whom Ngorm described as a

24

street beggar.  Ngorm was shown a photospread with John Doe 2's photograph in position number 3, and he identified the boy in number 3 as the boy who came to the guesthouse with "Alleq."

      b.   The boy appeared to be about twelve years old. Ngorm  had very limited conversation with "Alleq."

      c.   "Alleq" paid in cash when he resided at the guesthouse.  Ngorm observed "Alleq" and the boy whose photograph he had identified swimming at the guesthouse pool and eating at the guesthouse restaurant many times during their stay.  "Alleq" acted friendly and playful towards the boy when they were in the pool.

      d.   Ngorm was shown an additional photospread that contained a photograph of John Doe 1, and he did not recognize anyone in the photospread.

      e.   "Alleq" drove a green, Honda Wave motorbike on one occasion, and on a second occasion a 2006 black Honda Dream motorbike.  "Alleq" said that he was from America and that he had a computer business.

      f.   "Alleq" told him that the boy was homeless, that he wanted to adopt him, and that he ["Alleq"] paid for the boy's schooling, bicycle, and food and gave money to the boy's family.

g.    On "Alleq'"s first visit to the guesthouse, he came from somewhere in Phnom Penh, and on his second visit to the guesthouse he came from Battambang.  "Alleq" left the guesthouse headed for Battambang.  On both visits to the guesthouse, "Alleq" was accompanied by the boy whose photographs Ngorm had identified.  The timeframe between the two visits by "Alleq" and the boy was about one month.

h.    "Alleq" had a black laptop computer.

i.    "Alleq" is bald.  "Alleq" appeared to be a good guy and very polite.

53.  SAs Panganiban and Mack and Investigator Sous interviewed Victor Kang, the guesthouse owner's son, at 'Club Evergreen' guesthouse.  Kang was shown the photospread with PEETERS' photograph in position number 4, and he identified the photograph in position 4 as a man named "Alex" who had stayed at the Club Evergreen guesthouse three to four months earlier. Kang stated the following:

a.    Alex paid approximately $30 dollars per night. Alex was about 39 years old and came to the guesthouse with a boy.  Kang was shown a photospread with John Doe 2 in position 3, and Kang identified the photograph in position 3 the boy who accompanied "Alex" to the guesthouse.

26

b.   "Alex" came to the guesthouse in August or September 2008 and stayed in room 'A3'.

c.   Alex told him that he came from California, that he was in the information technology business, and that he had graduated from Devry or ITT.

d.   "Alex" stayed at the guesthouse about three times.  "Alex" stayed at the guesthouse for two weeks on his visit.  On his second visit, "Alex" stayed for approximately one month, and he came with two boys.  Kang was shown a third photo spread that contained a photograph of John Doe 1, but he did not recognize anyone from the photo array.

e.   "Alex" told Kang that "Alex" had stayed in Thailand but did not like it there.  "Alex" said that he was going to Sihanoukville.

f.   John Doe 2 went to school near the guesthouse.

g.   Kang showed us the room, where "Alex" had stayed and said that after "Alex" was there, the room had been painted from white to yellow, a second bed and seat cushions for the chairs had been added, and a round table had been removed.  Kang provided a cell phone number for "Alex."

54.  SAs Panganiban and Mack and Investigator Sous interviewed Thida Na, the housekeeper at the 'Club Evergreen'

27

guesthouse.   Na was shown a photospread with a photograph of
PEETERS in position number 4, and she identified the man in the
photograph at position 4 as a man named "Alex" who had stayed at
the guesthouse.   Na was also shown a photospread with a
photograph of John Doe 2 in position number 3, and she
identified the boy in the photograph at position 3 as a boy who
stayed at the guesthouse with "Alex."   Na was also shown a
photograph of John Doe 1, and she stated that she might have
seen that in the room with "Alex" and the boy whom she had
identified in the other photospread [John Doe 2].   Na cleaned
the room occupied by "Alex" when he stayed at the guesthouse.
Na stated that the room was always very messy and had a bad
smell.   Na did not see any condoms or KY jelly in the room.   Na
stated that she saw a computer and a small camera in the room,
and she did not see any photographs in the room.

G.    PEETERS' ITEMS

55.   On February 12, 2009, APLE turned over to SA Panganiban
and me 11 DVDs, 1 Bible, 3 phone chargers, and 4 CDs, all of
which had been abandoned by PEETERS in or about late
October, 2008, at CHRROY CANVAR guesthouse, located outside of
Phnom Penh, Cambodia.   According to Chhoun Sipaoeun, a former
receptionist at that guesthouse, PEETERS believed that he was

being followed by the police, and he departed the guesthouse quickly.  As a result of PEETERS' quick departure, PEETERS abandoned the foregoing items as well as some furniture.  After PEETERS' departure, Sipaoeun located the foregoing items and turned them over to an APLE Investigator.

56.   On February 12, 2009, as set forth above, ICE Agents interviewed John Doe 2 at the APLE office in Phnom Penh.  At the conclusion of that interview, SAs Li and Panganiban and Investigator Sous showed those items to John Doe 2. John Doe 2 physically examined all the items and told the Agents that they belonged to PEETERS.

57.   On or about February 24, 2009, SA Nguyen informed me of the following:

a.   On February 24, 2009, PEETERS was arrested in Siem Reap, Cambodia, by the CNP pursuant to an arrest warrant, for allegedly having sexual relations with minors.  The CNP arrested PEETERS after confirming his identity and location in Siem Reap.  On February 25, 2009, the CNP transported PEETERS to Phnom Pehn, Cambodia, to face charges.

58.   When the CNP arrested PEETERS, they seized his passport.   The stamps in the passport show that PEETERS entered Thailand on April 28, 2008 and entered Cambodia on May 23, 2008.

## IV.   CONCLUSION

59.   Based on the foregoing, there is probable cause to believe that ERIK LEONARDUS PEETERS violated Title 18, United States Code, Section 2423(c), Engaging in Illicit Sexual Conduct in Foreign Places.

PATRICK LI
Special Agent
United States Immigration and
Customs Enforcement


SUBSCRIBED TO AND SWORN BEFORE ME
THIS 12th DAY OF MAY 2009


UNITED STATES MAGISTRATE JUDGE

30